UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

VALERIE N. HUDSON,

                    Plaintiff,          Civil Action No. 12-13026
                                        Honorable Stephen J. Murphy, III
                                        Magistrate Judge David R. Grand

v.

COMMISSIONER OF
SOCIAL SECURITY,

                    Defendant.
_____/

**REPORT AND RECOMMENDATION**
**ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [11, 14]**

Plaintiff Valerie Hudson ("Hudson") brings this action pursuant to 42 U.S.C. §405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [11, 14], which have been referred to this court for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B).

**I.      RECOMMENDATION**

For the reasons set forth below, the court finds that substantial evidence supports the Administrative Law Judge's ("ALJ") conclusion that Hudson is not disabled under the Act. Accordingly, the court recommends that the Commissioner's Motion for Summary Judgment [14] be GRANTED, Hudson's Motion for Summary Judgment [11] be DENIED, and that, pursuant to sentence four of 42 U.S.C. §405(g), the ALJ's decision be AFFIRMED.

**II.     REPORT**

**A.      Procedural History**

On January 14, 2008, Hudson filed an application for SSI, alleging a disability onset date

of August 31, 2007.  (Tr. 134-37).  This application was denied initially on July 18, 2008.  (Tr.

75-78).  Hudson filed a timely request for an administrative hearing, which was held on June 29,

2010, before ALJ Ethel Revels.  (Tr. 33-73).  Hudson, who was represented by non-attorney

representative Andre Dale, testified at the hearing, as did vocational expert ("VE") John Stokes.

(*Id.*).  On October 28, 2010, the ALJ issued a written decision finding that Hudson is not

disabled.  (Tr. 18-28).  On May 16, 2012, the Appeals Council denied review.  (Tr. 1-5).  Hudson

filed for judicial review of the final decision on July 10, 2012.  (Doc. #1).

> **B.   Background**

>> *1.   Disability Reports*

In an undated disability report, Hudson indicated that her ability to work is limited by a

herniated disc in her back, HIV, allergies, depression, anxiety, and breathing problems.  (Tr.

163).  She further explained:

> I can't do any heavy lifting, bending, prolonged standing, walking, or
> sitting without lower back pain.  I get short of breath from a variety of
> items caused by allergies.  I have trouble getting motivated to do things.
> My memory has been getting worse.  I forget about appointments I have.

(*Id.*).  Hudson reported that these conditions first interfered with her ability to work in 1988, and

that she became unable to work on August 31, 2007.  (*Id.*).

At the time of the report, Hudson was 5'2" tall and weighed 195 pounds.  (Tr. 162).  She

had earned her GED and received additional clerical training.  (Tr. 168-69).  Prior to stopping

work, Hudson last worked babysitting for her grandchildren in her home.  (Tr. 164).

Hudson indicated that she had treated with several medical providers regarding her

physical and mental ailments.  (Tr. 165-67).  At the time of the report, she was taking Claritin

(for allergies) and Prilosec (for acid reflux disease).  (Tr. 168).  She had had an x-ray of her back

(in July of 2006) and a blood test (in November of 2007).  (*Id.*).

In a January 18, 2008 disability field office report, the claims examiner noted that, during a face-to-face interview, Hudson had difficulty concentrating, answering questions, standing, and walking.  (Tr. 160).  The claims examiner further observed that Hudson "had a poor memory," "had difficulty answering questions," and "seemed stiff and had some difficulty getting into and out of her chair."  (*Id.*).

In a function report dated January 7, 2008, Hudson reported that she lives in an apartment with her son.  (Tr. 150).  When asked to describe her daily activities, Hudson indicated that she reads magazines, watches television, talks to her daughter on the telephone, and reads her Bible.  (*Id.*).  On occasion, she leaves the house to go to the store, to the doctor, or to "take care of important business."  (*Id.*).  When asked to describe what she could do before the onset of her conditions that she can no longer do, Hudson said "socialize," "think without becom[ing] confused," and "move around good."  (Tr. 151).  Her back pain, coughing, and "recurring thoughts" interfere with her ability to sleep.  (*Id.*).  She is able to dress herself, bathe, and feed herself, although she often lacks the desire to do so.  (*Id.*).  She has problems concentrating, and she needs reminders to pick up prescriptions and attend doctors' appointments.  (Tr. 151-52).  Hudson prepares her own meals (sandwiches, salads, frozen meals), although her son helps her with cooking.  (Tr. 152).  She is able to do laundry, ironing, and some housework, with her son's help, although she "can't get back into the mood" to do these chores.  (*Id.*).  She goes outside once or twice every two weeks, but she does not drive.  (Tr. 153).  She is able, with help, to pay bills, count change, handle a savings account, and use a checkbook/money orders.  (*Id.*).  She talks with friends two or three times a week.  (Tr. 154).  In addition, she used to go to spiritual meetings two or three times a week; since her religious group remodeled and eliminated the room she used, however, she no longer attends these meetings.  (*Id.*).  She does not have any

3

problems getting along with family, friends, or neighbors.  (Tr. 155).

When asked to identify functions impacted by her conditions, Hudson checked lifting, squatting, bending, standing, reaching, walking, sitting, talking, memory, completing tasks, concentration, understanding, following instructions, and using her hands.  (*Id.*).  She can walk 6-8 blocks, if she has the "proper shoes."  (*Id.*).  She can pay attention for only one or two minutes, and she has trouble finishing what she starts.  (*Id.*).  She has difficulty following written instructions, and she can follow spoken instructions only if they are given slowly and repeated. (*Id.*).  She gets along well with authority figures and has never been fired from a job because of problems getting along with other people.  (Tr. 156).  She does not handle stress well, and she is afraid of facing people (whether on the phone or face-to-face).  (*Id.*).

In an undated disability appeals report, Hudson reported that, since August of 2008, her concentration and memory have worsened, and she is unable to stand fragrances and many cleaning products.  (Tr. 184).  Since the time of her last report, she had sought treatment (in the form of medication and therapy) for her "mental problems."  (Tr. 185).

### 2. *Plaintiff's Testimony*

At the June 29, 2010 hearing before the ALJ, Hudson testified that she earned her GED and took additional courses in accounting.  (Tr. 39).  Her last job was babysitting for her grandchildren, which she quit in August of 2007 because she "just didn't feel like doing anything for them" and, therefore, felt like she was "neglecting them."  (Tr. 39-40).  In her words, Hudson "couldn't function" because she was depressed and, as a result, could not cook,[1] get dressed, brush her teeth, or clean up.  (Tr. 41).  She testified that she takes medication for her depression, which makes her tired.  (Tr. 46-47).  Hudson also indicated that her depression makes it difficult

---

[1] In a disability appeals report, however, Hudson stated, "I burn things all the time when I am cooking because I forget about them."  (Tr. 187).

for her to leave the house and "deal with people"; she only leaves the house to visit her mother (once every month or two) and for doctor's appointments.  (Tr. 47).

When the ALJ asked about Hudson's other conditions, she testified that she has a herniated disc, spondylosis, and arthritis.  (Tr. 49).  She indicated that her back conditions cause problems with sitting, standing, and walking, and she takes Motrin for pain.  (Tr. 49-51).  Hudson also testified that she has HIV, for which she takes medication.  (Tr. 52-54).  When asked why she cannot work, Hudson said it was because of her depression and allergic reactions to fragrances and cleaning products.  (Tr. 56-57).  She testified that she cannot use public transportation because of "the fragrances and different smells."  (Tr. 57-58).  She also indicated that she does not like going out in public because she feels like people are watching her.  (Tr. 59).  She has difficulty with memory, and her son has had to call her twice to tell her she left something on the stove.  (Tr. 60).

### 3.    Medical Evidence

The ALJ found that Hudson suffers from the severe impairments of obesity, a herniated disc, allergies, depression, and anxiety.  (Tr. 20).  She also found that Hudson has the non-severe impairment of HIV.  (*Id.*).  Medical evidence pertaining to these conditions is discussed in chronological order below.

### (a)    Medical Evidence Prior to Hudson's Application Date[2]

Hudson began receiving treatment for HIV at least as early as October 2001.  (Tr. 235).  At a doctor's visit in March 2002, Dr. Patricia Brown noted that Hudson had a CD4 cell count of

---

[2] As the Sixth Circuit has recognized, "The proper inquiry in an application for SSI benefits is whether the plaintiff was disabled on or after the application date."  *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993).  To present a complete picture of Hudson's health, however, the Court will discuss evidence of her conditions prior to the application date.

544 and a viral load of 3,500,[3] and stated that as long as her CD4 count remained over 350 and her viral load was less than 50,000 she did not need anti-retroviral therapy. (Tr. 236). Although Hudson complained of some increased fatigue and decreased energy level at that visit, Dr. Brown believed it could be related to her obesity. (*Id.*). Numerous test results between 2001 and January of 2008 show that Hudson's CD4 count remained above 350, and her viral load was above 50,000 only once. (Tr. 237, 248, 250, 252, 254, 256, 262, 267, 269, 389).

In September of 2004, Hudson complained of allergies triggered by perfumes, dust, and weather changes. (Tr. 237). She was referred to an allergist, and her Paxil prescription (for depression) was refilled. (*Id.*). Between 2002 and 2007, Hudson sporadically received treatment for depression. (Tr. 240-47). Generally speaking, she complained of anxiety, poor memory, and decreased energy and motivation, and she was prescribed medication. (*Id.*).

In August of 2005, a treatment provider noted that Hudson's HIV was "asymptomatic," and that she had not been on anti-retroviral therapy. (Tr. 255). She was seen in follow-up in November of 2005, at which time it was again noted that she was asymptomatic and that her HIV was stable. (Tr. 257).

In May of 2006, a doctor wrote a "To Whom It May Concern" note, in which she noted that Hudson had difficulty walking due to a lower back condition. (Tr. 238). In July of 2006, Hudson presented to a neurologist with complaints of "chronic back pain for many years," with numbness and tingling in the right leg and some numbness in the right foot. (Tr. 200). The doctor noted that Hudson had recently been seen in the emergency room, where a CT scan of her

---

[3] CD4 cells, also known as T-helper cells, are a type of white blood cell that fight infection. *See* http://aids.gov/hiv-aids-basics/just-diagnosed-with-hiv-aids/understand-your-test-results/cdr-count/index.html. The term "viral load" refers to the level of HIV in the blood. *See* http://aids.gov/hiv-aids-basics/just-diagnosed-with-hiv-aids/understand-your-test-results/viral-load/. Both of these measurements provide a way of gauging the progression of HIV.

abdomen and pelvis showed an anterior subluxation of L5 on S1. (*Id.*). The doctor's report indicated no diagnosis or treatment. (Tr. 200-02). Hudson returned to the neurologist in October of 2006 with similar complaints. (Tr. 204). On examination, her gait was unremarkable, she had moderately limited forward flexion of the back, and normal strength and sensation. (*Id.*). After reviewing Hudson's x-rays and MRI, the doctor diagnosed L5-S1 spondylolisthesis, L4-L5 degenerative disc disease, and right L5 radiculopathy. (Tr. 205). Physical therapy was recommended. (*Id.*).

In May of 2007, Hudson presented for a follow-up visit regarding her HIV and reported "no new complaints." (Tr. 262). It was noted that Hudson had obesity, depression, and a herniated disc, but her HIV was "stable." (Tr. 265). In June of 2007, a doctor wrote a note to excuse Hudson from jury duty, indicating that she had a history of degenerative joint disease and lumbar disc herniation, both of which made sitting for long periods of time difficult. (Tr. 239). In December of 2007, a physician noted that Hudson's HIV remained asymptomatic and clinically stable. (Tr. 266).

*(b)    Medical Evidence Subsequent to Hudson's Application Date*

In February of 2008, Hudson visited the doctor for an HIV evaluation. (Tr. 272-75). Although the handwritten treatment notes are difficult to decipher, it appears the doctor noted that Hudson's HIV was clinically stable and there was no need for treatment at the time. (Tr. 275). On March 4, 2008, Hudson presented to the emergency room with complaints of right-sided facial weakness. (Tr. 280). She had a face droop and could not raise her forehead on the right side. (Tr. 282-83). She was diagnosed with Bell's palsy and T-cell deficiency, given steroids and an anti-viral drug, and referred to a neurologist. (Tr. 283). Because she had HIV, the emergency room physician also ordered a CT scan of Hudson's head, which was normal.

7

(Tr. 281, 287).  On March 16, 2008, Hudson saw a physician for treatment of her conditions, including HIV, depression, and eczema.  (Tr. 278-79).  The physician noted that Hudson was not taking medication for her depression, and the cause of her Bell's palsy was unknown.  (Tr. 279).

On March 22, 2008, R. Hasan, M.D., a psychiatrist, performed a psychiatric evaluation of Hudson for the State of Michigan.  (Tr. 289-92).  Hudson reported that she was diagnosed with HIV in 1997 and her depression had worsened since that time.  (Tr. 289).  She was feeling isolative and withdrawn, and had no motivation and crying spells.  (*Id.*).  She complained of vague suicidal ideations (with two "minor" past attempts), feelings of hopelessness and helplessness, and poor sleep.  (Tr. 290-91).  She reported having no close friends and getting along "average" with others.  (*Id.*).  Hudson indicated that she was able to do light chores and light cooking.  (Tr. 291).  She said she did not go to church and spent most of her time watching television or listening to the radio.  (*Id.*).  Dr. Hasan noted that Hudson's self-esteem and motor activity were low.  (*Id.*).  She was diagnosed with mood disorder and dysthymic disorder and assigned a Global Assessment of Functioning (GAF)[4] score of 55.  (Tr. 292).  Her prognosis was characterized as fair with treatment.  (*Id.*).

On April 2, 2008, Hudson sought treatment for low back pain and right facial and arm weakness.  (Tr. 356).  It was noted that her HIV was stable, with a CD4 count over 400, and her depression was unchanged.  (*Id.*).  A brain MRI was ordered due to Hudson's history of Bell's palsy and right arm weakness, and Motrin was prescribed for her back pain.  (Tr. 357).  Hudson had a follow-up HIV visit in May of 2008, at which time her CD4 count was 432.  (Tr. 372).

Hudson saw a social worker for therapy twice during April of 2008.  (Tr. 374-79).  At the

---

[4]  GAF examinations measure psychological, social, and occupational functioning on a continuum of mental-health status from 0 to 100, with lower scores indicating more severe mental limitations.  *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 276 (6th Cir. 2009).

first session, she complained of difficulty concentrating and completing tasks.  (Tr. 377).  She had a depressed mood, constricted affect, and a lack of interest and energy.  (Tr. 378).  At the next visit, the following week, the social worker noted an improvement in her mood.  (Tr. 375).

On April 22, 2008, Dr. Kokila Sheth reviewed Hudson's records and completed a mental residual functional capacity ("RFC") assessment and Psychiatric Review Technique.  (Tr. 294-311).  Dr. Sheth concluded that Hudson has moderate limitations in activities of daily living and in maintaining concentration, persistence, and pace, and a mild limitation in social functioning.[5] (Tr. 308).  Dr. Sheth further concluded that Hudson retains the ability to perform simple work on a sustained basis under supervision, with adequate pace and endurance.  (Tr. 310).

On June 20, 2008, Hudson underwent a consultative physical examination with Dr. Jai Prasad.  (Tr. 312-17).  Hudson complained of back pain with bending, standing, and sitting; allergies and difficulty breathing; and anxiety and depression.  (Tr. 312).  She reported having been diagnosed with HIV in 1997; Dr. Prasad noted that her CD4 count recently was 428, and she had never had antiviral treatment.  (Tr. 313).  Hudson had a normal gait and no sensory or motor deficits in the upper or lower extremities.  (Tr. 313-14).  Apparently, she had limitations in lumbar spine movement and bilateral positive straight leg raising tests.  (Tr. 314, 316).  Dr. Prasad diagnosed HIV with a CD4 count of over 400; Bell's palsy, from which she was recovering; low back pain; seasonal allergies and respiratory problems; and depression.  (Tr. 315).

In July of 2008, Dr. Demetrio Nasol completed a physical RFC assessment.  (Tr. 321-28).

---

[5] Specifically, Dr. Sheth opined that Hudson is moderately limited in four areas:  the ability to understand and remember detailed instructions;  maintain attention and concentration for extended periods; accept instructions and respond appropriately to criticism from supervisors; and respond appropriately to changes in the work setting.  (Tr. 294-95).  Dr. Sheth found Hudson not significantly limited in the remaining sixteen areas evaluated.  (*Id.*).

After reviewing Hudson's records, he opined that she can occasionally lift and carry 20 pounds, frequently lift and carry 10 pounds, stand and/or walk for six hours per workday, and sit for six hours per workday. (Tr. 322). Dr. Nasol further opined that Hudson can occasionally perform all postural maneuvers and should avoid concentrated exposure to wetness, humidity, and respiratory irritants (fumes, odors, dusts, gases, etc.). (Tr. 323, 325).

In September of 2008, Mary Brehler, a social worker, wrote a note indicating that Hudson was being treated for recurrent major depression, and that because she had problems with concentration and memory, she should be excused from jury duty. (Tr. 342).

In November of 2008, Hudson was referred for testing by Ms. Brehler, who suspected that she might have attention deficit disorder ("ADD"). (Tr. 344-50). Hudson reported difficulty with concentration and short-term memory; feelings of worthlessness, helplessness, and hopelessness; and difficulty following through with things. (Tr. 344). On examination, Hudson had a depressed mood and affect, displayed psychomotor retardation, and showed varying degrees of motivation (depending on her fatigue level). (Tr. 346). Testing showed a moderate degree of depression, but not ADD. (Tr. 349). The psychologist noted that some of Ms. Hudson's inattentive symptoms were indicative of depression (such as difficulty sustaining attention and not following through with tasks). (*Id.*). The psychologist opined that Hudson's depression was not the result of HIV, but was a continuation of a long-standing history of depressive episodes. (*Id.*). In conclusion, the psychologist diagnosed major depressive disorder (moderate, recurrent), with a GAF score of 50, and recommended continued medication management. (Tr. 349-50).

Blood tests in December of 2008 and January of 2009 showed CD4 levels of 289 and 320, respectively. (Tr. 361-62). On September 21, 2009, one of Hudson's physicians wrote a

10

letter stating that she would need transportation because she was "depressed all the time and [had] ongoing problems with fatigue secondary to depression." (Tr. 337). The note further indicated that Hudson has allergies to various scents and colognes, which also makes using public transportation difficult. (*Id.*).

In November of 2009, Hudson was seen for a follow-up HIV visit. (Tr. 368-70). The doctor noted that Hudson started medication for this condition in March of 2009, and her associated symptoms were anxiety, depressed mood, and fatigue. (Tr. 368). She had no muscle pain. (*Id.*). The doctor noted that her HIV was controlled, and tests showed a CD4 level of 506 and a viral load under 48. (Tr. 370). Hudson returned for HIV evaluations in February and April of 2010. (Tr. 364-67). At the first visit, Hudson indicated that she had had a two-week lapse in her medication because of insurance problems, but she reported doing well overall. (Tr. 366).

In June of 2010, Hudson saw a nurse practitioner for medication management for her depression. (Tr. 353-55). She reported having continued memory problems and being easily distracted. (Tr. 353). She was lethargic, with a constricted affect, slow speech, and a bizarre thought process. (*Id.*). She stated that she did little or nothing all day, rarely went out (because she was bothered by "smells"), had poor sleep patterns, and no motivation to cook. (Tr. 354). The nurse practitioner diagnosed cognitive disorder, major depressive disorder (recurrent, moderate), and anxiety, and continued Hudson's medications. (*Id.*).

The record also contains a one-paragraph, undated note indicating that Hudson is allergic to some perfumes and colognes and that her allergies "could possibly interfere with her productivity at work." (Tr. 338).[6]

---

[6] Hudson also submitted medical records to the Appeals Council after the ALJ's decision in this matter. (Tr. 393-401). Hudson does not refer to these records in her motion for summary judgment, however, and does not argue that this case should be remanded pursuant to sentence

4.      *Vocational Expert's Testimony*

John Stokes testified as an independent vocational expert ("VE").  (Tr. 67-73).  The VE first testified that Hudson has no past relevant work.  (Tr. 68).  The ALJ then asked the VE to imagine a claimant of Hudson's age, education, and work experience, who was limited to light work, with a sit/stand option; simple, repetitive tasks because of moderate limitations in the ability to maintain concentration for extended periods, as well as to understand and carry out detailed instructions; relatively clean air environment that does not require operating in temperature extremes or in wet, humid areas; no more than occasional climbing of stairs and ramps; no climbing of ladders, ropes, or scaffolds; only occasional stooping, kneeling, or crouching; no frequent bending; and no production requirement.  (Tr. 68-70).  The VE testified that the hypothetical individual would be capable of working in the positions of office clerk (an office helper) (4,100 jobs in Michigan and 152,000 jobs nationally) and receptionist/information clerk (1,800 jobs in Michigan and 70,000 jobs nationally).  (Tr. 69-70).

C.      **Framework for Disability Determinations**

Under the Act, SSI is available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" in relevant part as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §1382c(a)(3)(A).  The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

---

six of 42 U.S.C. §405(g) for consideration of new and material evidence.  Moreover, where, as here, the Appeals Council considered these records in declining to review Hudson's SSI application on the merits (Tr. 4-5), this court "cannot consider that new evidence in deciding whether to uphold, modify, or reverse the ALJ's decision."  *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996).

Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. §§404.1520, 416.920); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps ….  If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D.    The ALJ's Findings

Following the five-step sequential analysis, the ALJ found that Hudson is not disabled under the Act.  At Step One, the ALJ found that Hudson has not engaged in substantial gainful activity since January 14, 2008, her application date.[7]  (Tr. 20).  At Step Two, the ALJ found that Hudson has the severe impairments of obesity, a herniated disc, allergies, depression, and

---

[7] Although the ALJ references an application date of January 8, 2008, it appears that Hudson actually applied for SSI on January 14, 2008.  (Tr. 134-37).

anxiety.  (*Id.*).  The ALJ also found that Hudson has the non-severe impairment of HIV.  (*Id.*).
At Step Three, the ALJ found that Hudson's impairments, whether considered alone or in
combination, do not meet or medically equal a listed impairment.  (Tr. 21-22).

The ALJ then assessed Hudson's RFC, concluding that she is capable of performing light
work, with the following additional limitations:  sit/stand at will option; simple, repetitive tasks
because of moderate limitations in the ability to maintain concentration for extended periods, as
well as to understand and carry out detailed instructions; relatively clean air environment that
does not require operating in temperature extremes or in wet, humid areas; no more than
occasional climbing of stairs and ramps; no climbing of ladders, ropes, or scaffolds; only
occasional stooping, kneeling, or crouching; no frequent bending; and no production
requirement.  (Tr. 22-26).

At Step Four, the ALJ determined that Hudson has no past relevant work.  (Tr. 26).  At
Step Five, the ALJ concluded, based in part on the VE's testimony, that Hudson is capable of
performing a significant number of jobs that exist in the national economy.  (Tr. 26-27).  As a
result, the ALJ concluded that Hudson is not disabled under the Act.  (Tr. 27-28).

### E.      Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative
decision pursuant to 42 U.S.C. §405(g).  Judicial review under this statute is limited in that the
court "must affirm the Commissioner's conclusions absent a determination that the
Commissioner has failed to apply the correct legal standard or has made findings of fact
unsupported by substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d
591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d
647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not

14

remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).  In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole.  *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).  The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ.  *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record.  *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted).  If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

F.      **Analysis**

1.      *Substantial Evidence Supports the ALJ's Conclusions, at Steps Two and Three, that Hudson's HIV is Not a Severe Impairment And Does Not Meet or Medically Equal a Listed Impairment*

As set forth above, the ALJ found that Hudson has the severe impairments of obesity, a herniated disc, allergies, depression, and anxiety.  (Tr. 20).  However, she also found at Step Two that Hudson's HIV is asymptomatic, causes no more than minimal functional limitations and, thus, is non-severe within the meaning of the Act.  (*Id.*).  In her motion for summary judgment, Hudson argues that the ALJ's conclusion about the severity of her HIV is not supported by substantial evidence.  (Doc. #11 at 9).

As an initial matter, even if the ALJ erred in concluding that Hudson's HIV is a non-severe impairment, that error would be harmless.  As the ALJ noted in her decision, at Step Two she was required to determine whether Hudson has "**a** medically determinable impairment that is 'severe' or a combination of impairments that is 'severe.'"  (Tr. 19) (citing 20 C.F.R. §416.920(c)) (emphasis added).  Thus, the ALJ's finding that Hudson suffers from severe physical and mental impairments (including obesity, a herniated disc, allergies, depression, and anxiety) was all that was required for her to progress to Step Three.  *See Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987) (the Secretary's failure to find that claimant's cervical condition constituted a severe impairment did not constitute reversible error where he found the existence of other severe impairments and proceeded to Step Three).  This legal principle is aptly explained in *Maziarz*.

In *Maziarz*, the plaintiff allegedly suffered from various impairments.  At Step II, the Secretary found that Maziarz's heart conditions constituted a "severe" impairment under the regulations, but did not find his alleged cervical condition to be "severe."  *Id.* at 242, 244.  Ultimately, the Secretary found Maziarz not disabled.  Maziarz argued on appeal that the

16

Secretary erred by not finding his cervical condition to be severe.  *Id.* at 244.  The Sixth Circuit

rejected that argument, holding that because the Secretary had found at least one other "severe"

limitation, the severity of Maziarz's cervical condition was irrelevant to the Step II analysis:

> According to the regulations, upon determining that a claimant has one
> severe impairment, the Secretary must continue with the remaining steps in
> his disability evaluation as outlined above.   In the instant case, the
> Secretary found that Maziarz suffered from the severe impairment of [heart
> disease].   Accordingly, the Secretary continued with the remaining steps in
> his disability determination.   Since the Secretary properly could consider
> claimant's cervical condition in determining whether claimant retained
> sufficient residual functional capacity to allow him to perform substantial
> gainful activity, the Secretary's failure to find that claimant's cervical
> condition constituted a severe impairment could not constitute reversible
> error.

*Id.* at 244.  In other words, once the ALJ finds a severe impairment at Step II, he moves on to the

remaining sequential steps where he considers the claimant's severe and non-severe

impairments.  *Id.*  *See also Anthony v. Astrue*, 266 Fed. Appx. 451, 457 (6th Cir. 2008); *Fisk v.

Astrue*, 253 Fed. Appx. 580, 584 (6th Cir. 2007) (noting that once the ALJ determines at least one

severe impairment, he "must consider limitations and restrictions imposed by all of an

individual's impairments, even those that are not 'severe.'") (citing Soc. Sec. Rul. 96-8p, 1996

WL 374184, at *5); *Pompa v. Comm'r of Soc. Security*, 73 Fed. Appx. 801, 803 (6th Cir. 2003).

That is exactly what took place here, where the ALJ found Hudson had certain "severe"

impairments, then proceeded to the next sequential steps in the disability analysis.  (Tr. 20-21).

Accordingly, the ALJ's finding that Hudson's HIV was not a "severe" limitation cannot be

grounds for remand.

    Moreover, the ALJ did not err in finding Hudson's HIV to be a non-severe impairment.

At Step Two of the sequential evaluation process, the ALJ must consider whether a claimant has

a severe impairment.  *See* 20 C.F.R. §416.920(a)(4).   "To surmount the step two hurdle, the

17

applicant bears the ultimate burden of establishing that the administrative record contains objective medical evidence suggesting that the applicant was 'disabled,' as defined by the Act . . . ." *Despins v. Comm'r of Soc. Sec.*, 257 F. App'x 923, 929 (6th Cir. 2007).  The applicable regulations generally define a "severe" impairment as an "impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities . . . ." 20 C.F.R. §416.920(c).  Basic work activities are defined in the regulations as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. §416.921(b).  Examples include:  (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting.  *See id.*

The Sixth Circuit has "characterized step two of the disability determination process as a '*de minimis* hurdle.'"  *Despins*, 257 F. App'x at 929.  "[A]n impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience."  *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988).  Nonetheless, not all impairments are severe:  "The mere existence of . . . impairments . . . does not establish that [the claimant] was significantly limited from performing basic work activities for a continuous period of time."  *Despins*, 257 F. App'x at 930.  In considering whether a claimant has a severe impairment, an ALJ need not accept unsupported medical opinions or a claimant's subjective complaints.  *See Weckbacher v. Comm'r of Soc. Sec.*, 2012 WL 2809697, at *9 (S.D. Ohio July 10, 2012).

With respect to Hudson's HIV, there is substantial evidence in the record supporting the

18

ALJ's conclusion that this condition does not rise to the level of a severe impairment under the Act. There is no evidence in the record that Hudson's HIV was symptomatic. Although Hudson asserts in her motion that "[s]he has constant muscle aches and infections related to her HIV status" (Doc. #11 at 8), there is simply no indication in the record that this is the case. Having reviewed the medical records, the Court has found no evidence that Hudson complained of "muscle aches" or "infections" relating to her HIV. Moreover, when asked at the hearing why she cannot work, Hudson specifically testified that it was because of her depression and allergic reactions to fragrances and cleaning products, not because her HIV is limiting in some respect. (Tr. 56-57). As such, Hudson has failed to establish that her HIV limits any basic work activity, and the ALJ's conclusion that this condition is non-severe is supported by substantial evidence.

Hudson's argument that the ALJ "completely ignore[d] the third step" in failing to analyze whether her HIV is presumptively disabling (at Step Three) also fails. (Doc. #11 at 9-12). Under the theory of presumptive disability, a claimant is eligible for benefits if she has an impairment that meets or medically equals a listed impairment. *See Christephore v. Comm'r of Soc. Sec.*, 2012 WL 2274328, at *6 (E.D. Mich. June 18, 2012). When considering presumptive disability at Step Three, "an ALJ must analyze the claimant's impairments in relation to the Listed Impairments and must give a reasoned explanation of his findings and conclusions in order to facilitate meaningful review." *Id.* (citing *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011)). Here, the ALJ specifically indicated that she considered Hudson's HIV under Listing 14.08 ("Human immunodeficiency virus (HIV) infection") and concluded that the medical evidence does not document "listing-level severity." (Tr. 21).

Hudson has offered no evidence to support her contention that the ALJ should have found at Step Three that her HIV satisfies the criteria of Listing 14.08 (or any other listed impairment,

for that matter).  *See Roby v. Comm'r of Soc. Sec.*, 48 F. App'x 532, 536 (6th Cir. 2002) ("The claimant has the burden at the third step of the sequential evaluation to establish that he meets or equals a listed impairment.") (internal citations omitted).  Although Hudson criticizes the ALJ for not providing enough detail in her discussion of whether Hudson's HIV is presumptively disabling at Step Three,[8] Hudson does not even *attempt* to explain why she believes her HIV meets or medically equals the criteria of a Listing.  "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria."  *Sullivan v. Zebely*, 493 U.S. 521, 530 (1990) (emphasis in original).  Here, where Hudson has failed to proffer any evidence that her HIV meets or medically equals the criteria of a listed impairment, and where substantial evidence supports the ALJ's determination that her HIV is not a severe impairment, she has not shown that the ALJ erred.

   2.   *The ALJ's Credibility Determination is Supported by Substantial Evidence*

   Hudson also argues that the ALJ erred in failing to adequately assess the credibility of her subjective complaints.  As the Sixth Circuit has held, determinations of credibility related to subjective complaints of pain rest with the ALJ because "the ALJ's opportunity to observe the demeanor of the claimant 'is invaluable, and should not be discarded lightly.'"  *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524, 538 (6th Cir. 1981) (quoting *Beavers v. Sec'y of Health, Ed. & Welfare*, 577 F.2d 383, 387 (6th Cir. 1978)).  Thus, an ALJ's credibility determination will not be disturbed "absent compelling reason."  *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001).  The ALJ is not required to accept a claimant's testimony if it conflicts with medical reports and

---

[8] In support of her argument that the ALJ should have provided a more thorough Step Three analysis, Hudson cites *Christephore, supra,* and *Reynolds, supra*.  (Doc. #11 at 10-12).  In both cases, the courts found that the ALJs did not provide adequate explanations for why the respective claimants' severe impairments did not meet or equal a Listing.  In this case, however, the ALJ properly concluded that Hudson's HIV is *non-severe*.  Thus, these cases are distinguishable and do not compel a conclusion that the ALJ's analysis in this case was insufficient.

other evidence in the record. *See Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 531 (6th Cir. 1997). Rather, when a complaint of pain is in issue, after the ALJ finds a medical condition that could reasonably be expected to produce the claimant's alleged symptoms, she must consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians . . . and any other relevant evidence in the case record" to determine if the claimant's claims regarding the level of his pain are credible. *Soc. Sec. Rul.* 96-7p, 1996 WL 374186 (July 2, 1996); *see also* 20 C.F.R. §404.1529.

In this case, Hudson asserts that although the ALJ listed the relevant credibility factors, she did not "explain why claimant is not credible in her view." (Doc. #11 at 13) (citing Tr. 23). This is incorrect. In her decision, the ALJ gave several good reasons for discounting Hudson's credibility. (Tr. 26). Specifically, the ALJ noted inconsistencies between Hudson's alleged limitations and her reported daily activities, and she characterized Hudson as "evasive" in her testimony. (*Id.*). Substantial evidence supports both of these findings.

The ALJ first noted several discrepancies between Hudson's statements concerning her limitations and her reported activities. (*Id.*). *See Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence."). Specifically, the ALJ noted that Hudson "alleges that she isolates herself and cannot deal with people because of her depression," but also reported that she regularly attended spiritual meetings two or three times a week until her religious group remodeled and eliminated the room she used for those meetings. (Tr. 26, 47, 154). Hudson also reported that she lives with her son and speaks with friends two or three times a week. (Tr. 49, 154).

21

Similarly, the ALJ noted that Hudson "alleges she has concentration problems," but reported being able, with help, to pay bills, count change, handle a savings account, and use a checkbook. (Tr. 26, 153). And, as the ALJ also noted, despite the fact that Hudson complains of low back pain, she indicated in a Function Report that she has no problem dressing or bathing and reported to a consultative examiner that she is able to do light chores and light cooking. (Tr. 26, 151, 291). The ALJ also noted that Hudson testified somewhat inconsistently that she does not cook and that her son has had to call her on two occasions to tell her that she left a pot on a hot stove. (Tr. 26, 41, 60).

The ALJ also discounted Hudson's testimony because she found her to be "evasive [in her testimony] regarding her recent doctor's visits and the transportation she used to get to the doctor." (Tr. 26). A review of Hudson's hearing testimony reveals that she was, in fact, quite vague and unclear as to when she received treatment, which medical providers she saw, and how she got to her appointments. (Tr. 58, 62-66). It was the ALJ who had the opportunity to observe Hudson's demeanor when giving this testimony, and her conclusion that certain of Hudson's statements were not entirely reliable should be given deference. *See Casey*, 987 F.2d at 1234 (explaining that because the ALJ is able to observe the demeanor of a witness, her conclusions should be accorded deference).[9]

In summary, the ALJ recognized the duty imposed upon her by the regulations and, in addition to Hudson's own subjective complaints, she considered the objective medical evidence,

_____

[9] Hudson also asserts that the ALJ's credibility finding "is more about her frustration over [Hudson's] attorney's actions than that of the case itself." (Doc. #11 at 14) (citing Tr. 55, 56, 64). The Court disagrees. A review of the relevant portions of the hearing transcript reveals that the ALJ expressed frustration that Hudson's representative was not prepared at the hearing and indicated that this could hinder her ability to make a credibility evaluation. (Tr. 64). The ALJ did not state, however, that she was basing her credibility determination on Hudson's representative's lack of preparation, nor is there any indication in the record that she did so.

statements made in reports, Hudson's daily activities during the relevant time period, and her hearing demeanor. (Tr. 22-26). While Hudson might disagree with the ALJ's credibility assessment, she has failed to articulate a basis for overturning that finding, particularly in light of the great weight and deference an ALJ's credibility finding is due on review. *See Kirk,* 667 F.2d at 538; *Smith,* 307 F.3d at 379. Here, where the ALJ gave a reasonable explanation for discounting Hudson's credibility, and that explanation is supported by substantial evidence, her credibility finding should not be disturbed.

## III.   CONCLUSION

For the foregoing reasons, the court RECOMMENDS that the Commissioner's Motion for Summary Judgment [14] be GRANTED, Hudson's Motion for Summary Judgment [11] be DENIED, and the ALJ's decision be AFFIRMED.

Dated: June 18, 2013                              s/David R. Grand
Ann Arbor, Michigan                          DAVID R. GRAND
                                                          United States Magistrate Judge


## NOTICE

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and Fed. R. Civ. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir. 1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to

23

E.D. Mich. L.R. 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.


## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on June 18, 2013.

s/Felicia M. Moses
FELICIA M. MOSES
Case Manager